Sebastian ROBINSON,
et al., Appellants,

v.

AHMAD CARDIOLOGY, INC.,
et al., Respondents.

No. ED 77075.

Missouri Court of Appeals,
Eastern District,
Division One.

Oct. 31, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 7, 2000.

Michael A. Gross, MacArthur Moten, St. Louis, for appellants.

Robert S. Rosenthal, T. Michael Ward, Amy L. Klingermann, Brown & James, P.C., St. Louis, for respondents.

TEITELMAN, Judge.

Sebastian Robinson (hereinafter, "Appellant") appeals from the judgment entered in the Circuit Court of the City of St. Louis granting Respondents' motion for summary judgment in Appellant's negligence action. We reverse and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 16, 1995, Colleen Crenshaw, Appellant's mother, went to the emergency room of Deaconess Hospital because she was experiencing chest pain. The emergency room personnel determined that she had suffered a heart attack and treated her for that condition. The hospital admitted Ms. Crenshaw to the coronary care unit for further diagnosis and treatment.

Naseer Ahmad, M.D., performed a heart catheterization and angioplasty upon Ms. Crenshaw during the morning of November 17, 1995. She was alert and communicative until that evening. Ms. Crenshaw began to exhibit changes in her oxygen saturation rate and shortness of breath that night and the following morning. She died as the result of pulmonary edema and cardiac arrest at 8:43 a.m. on November 18, 1995.

Appellant's grandmother and next friend filed suit for him against Dr. Ahmad, Dr. Hernandez and Ahmad Cardiology, Inc. (hereinafter, "Respondents"). Appellant's petition alleged that Dr. Ahmad and Dr. Hernandez had provided treatment for Ms. Crenshaw at Deaconess Hospital on November 17, 1995, and then had left the hospital without giving adequate information about her condition and medical needs to physicians and other hospital personnel responsible for her medical care that night. Appellant claimed that Ms. Crenshaw had died as a consequence of that failure.

The Respondents filed motions for summary judgment. Their motion alleged that "the undisputed facts show that [Respondents] documented in the medical records the information necessary to enable the other doctors to care for Colleen Crenshaw," and that "the intern had access to this information and indeed was aware of the information." In support of their motion, Respondents claimed that they had written "specific post operative orders directing Ms. Crenshaw's care." They offered deposition testimony of Christopher Conger, D.O., the intern who became responsible for Ms. Crenshaw's care on the night of November 17, 1995, as proof that they had adequately apprised the house

medical staff of Ms. Crenshaw's condition and medical needs.

Dr. Conger testified in his deposition that either Dr. Ahmad or Dr. Hernandez had spoken with him about Ms. Crenshaw after her heart catheterization on November 17, 1995. According to Conger, he was apprised in that conversation and by the Respondents' written post-procedure report that Ms. Crenshaw had undergone heart catheterization, that stents had been placed in her heart, and that the stents had been implanted "secondary to increased risk of restenosis."

Steven R. White, M.D., also testified by deposition. Dr. White stated that he was critical of Dr. Ahmad's treatment of Ms. Crenshaw. He explained:

> "Dr. Ahmad, as the covering physician, the covering attending physician for Miss Crenshaw that evening, has a responsibility to know what's happening. He was there for the cardiac cath. He placed the stents himself. He knew of her situation. He had a responsibility to ensure that the house staff were appropriately forewarned about complications.... [H]e has a responsibility to make sure that [the house physicians] know about the special problems here, including the LVEDP that's elevated and educating them, there's a risk here: keep an eye on this patient here tonight, she's 36 hours after her MI. She's just had stents placed. She has an elevated LVEDP. She could very well go into pulmonary edema or heart failure, in addition to all the other things that could happen to her. So keep an eye on her."

Dr. White subsequently restated the information that he believed should have been provided by the defendants to the house physicians: "[This] patient's at risk in addition to all the usual things of a higher risk of developing heart failure or edema. So, watch her fluid status, and if there's a problem, call me."

Dr. White explained his opinion that merely writing notes on the patient's medical chart did not constitute adequate communication of the patient's particular medical needs to the house staff:

> I think you have to understand how a sign-out is done. A sign-out is not a rote recitation of the facts. A sign-out is a bringing together of the information with a clear understanding of what has to happen. And so Dr. Conger can read the chart, but it's not the same as the attending doctor saying to him right here in his face, this distance apart, saying here's what's going on. Here's what you have to look out for. Here's what you need to do. Here's when you call me. Do you understand this? And that's what an effective sign-out is.... So let's not confuse the fact that there are some things written down on paper somewhere with making sure that the house staff have a clear understanding of what's going on.

He explained his opinion further:

> And you have to understand how a critical care unit works. You've got critically ill patients. Attendants are responsible for these patients. They have house staff there. Now, the house staff have their responsibilities. One of those is to call [the attending physician when assistance is required]. But the attending also has to make sure that they know the ground rules of when to call, and what they need to know, and to make sure that they have an understanding of what's going on. It's one thing just to read in the chart, oh, yeah, the LVEDP is 25, but the house staff needs to know what that means. I don't expect a six-month fresh intern to have a perfect understanding of all of this. That's why [they are interns].... Who's Dr. Conger going to learn from? Dr. Ahmad. If Dr. Ahmad doesn't set the stage for them to know their jobs and to take care of a patient properly, then Dr. Ahmad has a responsibility that he hasn't met, and that's what I'm trying to say here.

Dr. White also stated his opinion "to a reasonable degree of medical certainty" that Dr. Ahmad's communication with Dr. Conger "didn't work" and "wasn't effective."

Warren Israel, M.D., also testified by deposition. Dr. Israel stated his opinion regarding the organic cause of Ms. Crenshaw's death: "My opinion is that she went into progressive pulmonary edema the night of November 17th to November 18th, and that's why she died." He testified regarding his criticism of the medical care given by Dr. Ahmad and Dr. Hernandez on November 17, 1995:

> First of all, I believe that either Dr. Hernandez or Dr. Ahmad should have specifically alerted the house staff that this patient was in borderline congestive heart failure and that she needed to be watched closely and given diuretic at the first sign of any decompression, at the first sign of any pulmonary problems.

Dr. Israel explained:

> The only criticism I have is that [Dr. Hernandez] and Dr. Ahmad—I see them as a team of cardiologists. One of those two doctors needed to express to the house staff specifically the nature of the situation that that patient had in the cath lab and coming out of the cath lab, to alert them to the fact that this is a patient that might go into congestive heart failure quickly.... [O]ne of the two of them had to tell somebody what was going on.

Dr. Israel stated his opinion that the pulmonary edema that caused Ms. Crenshaw's death had resulted from "the original [myocardial infarction] plus the inadequate treatment." He explained that Ms. Crenshaw's death "would have been less likely to occur" if Dr. Ahmad and Dr. Hernandez had "impressed upon the staff taking care of the patient that this patient had the potential for decompensation; and, if things don't go well, call me." He also testified that he could not specify which of the medical responses of which Ms. Crenshaw was deprived "eventually led to her demise," but stated his opinion that "[i]t was the whole process of inadequate treatment that caused her to die."

The trial court granted Respondents' motion for summary judgment. The court characterized Dr. Israel as the Appellant's "only critical expert" and concluded: "[i]t appears that [his] testimony is rebutted by the testimony of Dr. Conger." The court explained: "Dr. Conger testified that he was made aware of the decedent's condition and risks thereof by either Dr. Hernandez or Dr. Ahmad before they went off duty." And:

> [T]he testimony of Dr. Conger was that he was adequately apprised of the decedent's precarious condition. [Appellant's] only allegation of negligence against Dr. Ahmad is that he did not adequately apprise hospital staff of the decedent's condition. It is apparent from the record that [Appellant] will be unable to prove his claims against Dr. Ahmad.

The court stated only the following about Dr. White's testimony: "Dr. White specifically testified that he had no criticism of Dr. Hernandez in this case ... Dr. White also testified that apart from the conduct of Dr. Ahmad, he had no criticism of Ahmad Cardiology, Inc., in this case."

Appellant now appeals from the summary judgment entered in favor of Respondents. He argues that the trial court erred in granting the summary judgment motion because Respondents failed to establish that no genuine dispute exists regarding the adequacy of Dr. Ahmad's and Dr. Hernandez's "check-out" on the afternoon preceding Ms. Crenshaw's death.

### STANDARD OF REVIEW

■ On review of a summary judgment, we review the trial court's judgment de novo. *ITT Commercial Finance Corporation v. Mid–America Marine Supply Corporation,* 854 S.W.2d 371, 376 (Mo. banc 1993). We view the record in the light most favorable to the party against whom

the judgment was entered. *Bear Foot, Inc. v. Chandler*, 965 S.W.2d 386, 388 (Mo. App. E.D.1998), citing *ITT Commercial Finance*, 854 S.W.2d at 376. As summary judgment is a question of law, we use the same criteria as the trial court in determining whether judgment was proper. *Id.* A party moving for summary judgment has the burden to demonstrate that no issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *George Walsh Chevrolet, Inc. v. Dieters*, 864 S.W.2d 934, 935 (Mo. App. E.D.1993); Rule 74.04(c). A genuine issue may not consist of mere "conjecture, theory and possibilities." *Bear Foot, Inc. v. Chandler*, 965 S.W.2d at 388, citing *ITT Commercial Finance*, 854 S.W.2d at 378.

## DISCUSSION

■ Appellant argues that the trial court erred in granting Respondents' motion for summary judgment because Respondents failed to establish that no genuine question of material fact existed regarding the adequacy of Dr. Ahmad's and Dr. Hernandez's "check-out" on the afternoon preceding Ms. Crenshaw's death. Appellant relies on the fact that Dr. White and Dr. Israel both testified that the treating physicians had failed to adequately apprise the house staff that Ms. Crenshaw was at risk of going quickly into congestive heart failure, that she needed to be watched closely and treated immediately for the first signs of pulmonary difficulty, and that the attending physicians should be notified promptly of any deterioration in her condition. Appellant argues that neither Dr. Conger's testimony nor any other evidence proffered by Respondents overcame the probative force of Dr. White's and Dr. Israel's testimony as a matter of law. We agree.

Dr. White testified to a reasonable degree of medical certainty that Dr. Ahmad failed to properly communicate with the house staff before leaving Ms. Crenshaw in their care. Dr. White stated that he reached this conclusion after reviewing the events of the last evening of Ms. Crenshaw's life and determining that proper procedures were not followed. Dr. White stated that Dr. Ahmad had the duty to effectively communicate proper procedures to the house staff before leaving, and the fact that the house staff failed to act appropriately as Ms. Crenshaw's condition deteriorated indicates that they were not aware of the her unique medical situation.

Dr. Israel testified that either Dr. Hernandez or Dr. Ahmad should have specifically alerted the house staff that Ms. Crenshaw was in borderline congestive heart failure and that she needed to be watched closely and given a diuretic at the first sign of any decompensation, or pulmonary problems.

Dr. Conger testified that he had been made aware of Ms. Crenshaw's heart catheterization procedure, and that two stents had been implanted during that procedure, and that the stent implantation had been effected "secondary to increased risk of restenosis." He did not, however, testify that he had been warned that the patient "was in borderline congestive heart failure" and "might go into congestive heart failure quickly." Nor did he testify that he had been warned that Ms. Crenshaw was "at risk in addition to all the usual things of a higher risk of developing heart failure or edema." He did not testify that he had been instructed to call either attending physician if any problem arose with Ms. Crenshaw's condition.

■ Missouri courts regard summary judgment as an "extreme and drastic remedy" that must be applied with the exercise of "great care." *ITT Commercial Finance*, 854 S.W.2d at 377 (quoting *Cooper v. Finke*, 376 S.W.2d 225, 229 (Mo.1964)); *Hammonds v. Jewish Hospital of St. Louis*, 899 S.W.2d 527, 529 (Mo.App. E.D. 1995). Respondents bore the burden of demonstrating that there is no genuine dispute regarding any fact material to the outcome of the case. *ITT Commercial Finance*, 854 S.W.2d at 378.

In this case, Respondents failed to demonstrate that no dispute exists. Viewed in a light most favorable to Appellant, the record reflects a genuine question of material fact regarding whether or not Drs. Ahmad and Hernandez effectively communicated Ms. Crenshaw's condition to Dr. Conger, and whether or not any such failure to communicate resulted in improper treatment that led to Ms. Crenshaw's death. These are questions of fact for a trier of fact, and summary judgment was improperly entered against Appellant.

We therefore reverse and remand this case for further proceedings consistent with this opinion.

ROBERT G. DOWD, Jr., P.J., and MARY RHODES RUSSELL, J., concur.